IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 2, 2021 Session

**IN RE AUTUMN H.**

**Appeal from the Juvenile Court for Williamson County**
**No. 35423     Sharon Guffee, Judge**

———————————————————

**No. M2020-01214-COA-R3-JV**

———————————————————

This appeal involves a mother's petition seeking to relocate to Canada with the parties' minor child. Determining relocation to Canada with the mother to be in the child's best interest, the juvenile court approved the mother's petition, and the father appealed to this Court. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Casey A. Long, Lawrenceburg, Tennessee, for the appellant, John G.

Joanne H., London, Ontario, Canada, Pro Se.

**OPINION**

**Background**

The mother, Joanne H. ("Mother"), is a Canadian citizen who came to the United States legally in 2006 or 2007. The minor child, Autumn H. ("the Child"), was born in July 2014 to Mother and the child's father, John G. ("Father"). Mother and Father were never married. Mother testified that she had been a stay-at-home mother since the Child was born. At some point, a temporary restraining order was entered prohibiting Mother from leaving the state of Tennessee with the Child. In December 2015, the Williamson County Juvenile Court ("Juvenile Court") entered an order leaving the temporary restraining order in effect but allowing Mother to take the Child to visit Mother's family in

Canada during the Christmas holiday but directing Mother to return the Child to this jurisdiction for further proceedings.

Subsequently, Mother was unable to renew her work visa, and it expired in March 2016. Mother testified that she had a six-month grace period to leave the country. Mother and Father obtained a marriage license in June 2016, but the marriage did not happen. The parties subsequently entered into an agreed permanent parenting plan in September 2016, wherein the parents were to spend equal parenting time with the Child.

Mother sent a certified letter to Father in May 2017, informing him of her intended relocation with the Child to Canada. According to Mother, Father again asked her to marry him and gave her a ring. Father obtained a second marriage license but let it expire. Mother was unable to change her residency status in this country. She was unable to gain employment or obtain a driver's license in the United States.

In February 2018, Mother filed a petition seeking approval by the Juvenile Court to move with the Child to Canada and to modify the parties' current permanent parenting plan. The petition states, *inter alia*, that (1) the parents had been awarded equal parenting time with the child by previous court order, (2) Mother provided Father with notice of her intent to relocate to Mississauga, Ontario via certified mail and hand delivery in May 2017, and (3) Father had failed to file a petition opposing the move. Mother therefore requested that she be permitted to relocate with the child to Canada, as well as modification of the parties' permanent parenting plan. Mother's letter expressing her intent to relocate with the child stated that the "purpose of the move is to pursue employment" because Mother was unable to obtain legal employment in the United States after the expiration of her visa.

Father subsequently filed an answer to Mother's petition, in which he denied receiving notice via certified mail but stated that Mother had showed him the notice while they were considering reconciliation and that they were subsequently engaged to be married. Father also filed a petition in opposition to Mother's notice to relocate with similar allegations as in his answer to Mother's petition and arguing that it was not in the Child's best interest to move to Canada. Both parties filed proposed parenting plans with their respective pleadings.

Following a motion by Father, the Juvenile Court appointed a guardian *ad litem*. Father subsequently filed a motion to appoint an expert witness, which was granted, and Dr. Bradley Freeman was appointed. The parties conducted discovery and the Juvenile Court resolved any issues between the parties pertaining to discovery.

The parties' petitions were heard by the Juvenile Court Magistrate, who subsequently entered an order permitting Mother to relocate to Canada with the Child. After the Magistrate's ruling, Father filed post-trial motions requesting several avenues of relief, which were denied except for providing Father with additional time to request a

rehearing. Following the Magistrate's ruling, Mother and the Child moved to Canada in June 2020 after the new permanent parenting plan went into effect. Father filed a request for a hearing before the Juvenile Court Judge, which was granted and a trial date scheduled.

The Juvenile Court Judge conducted a *de novo* trial over three days in August 2020, wherein the following witnesses testified: (1) Mother; (2) Joanne H., paternal grandmother ("Paternal Grandmother"); (3) Father; (4) Bradley Freeman, M.D., a forensic psychiatrist appointed by the court as an expert; and (5) Gail M., Mother's former mother-in-law from a previous marriage and the paternal grandmother to Mother's older daughter. Mother was *pro se* during trial and participated remotely from Canada. Because of the Covid-19 pandemic, the trial was conducted via video-conferencing software. Autumn was six years old at the time of trial.

The Trial Court considered evidence presented by Dr. Bradley Freeman, Associate Professor of Clinical Psychiatry at Vanderbilt University School of Medicine. Dr. Freeman testified during trial as an expert witness in forensic psychiatry and comprehensive fitness for parenting. Dr. Freeman had conducted a comprehensive evaluation on both parents in February 2019. In his report, Dr. Freeman opined that it would be in the Child's best interest to remain in Tennessee with Father. Sometime after preparation of his report, Dr. Freeman spoke again with the parties and the Child prior to trial. Dr. Freeman testified that his recommendations and opinions had not changed since his original report and that he believed Tennessee to be the more stable option for the Child. The Trial Court found that Dr. Freeman was a credible expert witness but determined that much of the information contained in Dr. Freeman's report was outdated by the time of trial because Mother had moved to Canada with the Child and had been residing there for approximately two months.

Neither parent was employed at the time of trial. During trial, Dr. Freeman opined that neither parent "had a super financial situation," but the Juvenile Court found that this had changed for Mother after her relocation to Canada. Mother testified that she received approximately $2,100 per month in income. According to Mother, she received a nominal amount of music royalties every quarter of approximately $50. Mother testified that she received child support for both of her children, totaling $1,100 per month, and Ontario work benefits of approximately $1,050 per month since her relocation to Canada. She also had applied for child benefits in Ontario that would be an additional $800 per month once approved. Mother also testified that she had $200 in her savings account and had been able to save an additional few thousand dollars.

Mother has custody of a nine year old half-sibling of the Child. Mother described the two children as best friends and having a lifelong and loving bond. According to Mother, she could not imagine separating the two siblings. Dr. Freeman testified that the Child had made a comment concerning fighting with her maternal half-sibling and sometimes feeling unsafe with her sister, but Dr. Freeman stated that he did not have "any strong information" that the sister had been aggressive toward the Child.

Mother has other family members in Canada. One of Mother's sisters lives approximately an hour away from Mother, and the other sister is approximately three hours away. Mother is also close with her former in-laws and the paternal grandparents of her older child, who live an hour and a half away from them and visit each weekend. Mother testified that she had been the primary caregiver for the Child during her whole life and that she "always picked up the slack." Mother testified that she encouraged the Child's relationship with Father and the Child's half-siblings in Tennessee and had included Father in the Child's activities.

Mother testified that she currently lived at Wasaga Beach, Ontario in a townhome owned by her former mother-in-law. When Mother and the Child returned to Canada, they were required to quarantine for fourteen days away from any other person. The home is currently listed for sale. When moving to Canada, Mother's living and employment plans changed due to the Covid-19 pandemic. She had been paying rent in the amount of $1,300 per month, which included utilities. Mother testified that she had applied for a custodial or cafeteria job at the Child's school making $23-25 an hour and that her previous employment plans of working with her brother-in-law in Toronto were changed due to the pandemic.

Father testified during trial he had not been able to work due to his back injury and was on TennCare. Father had been in a car accident with two of his children in March 2016 and injured his back. Father had back surgery in 2017. Father continued to work and was on pain medication through the end of 2017. According to Father, he could not "continue doing the lifestyle [he was] doing so [he] went and got off of the pain medication." Mother testified that Father attended an in-patient rehab for an opioid addiction during the month of December 2017. According to Mother, she cared for the Child during that whole month. Father testified that he had not been able to return to work but had been working with his doctors to control the pain. According to Father, his depression and pain is being managed by new medication.

Father's license to practice law in Tennessee had been suspended due to his failure to pay the required fees and to complete the necessary continuing legal education classes. By the time of trial, Father had completed the continuing legal education requirement and paid all his fees. He testified that he planned to seek reinstatement. He also is licensed to practice law in Florida. According to Father, he is ready to go back to work and should be able to obtain employment within a month. Father testified that he planned to adjust his work schedule to be home when the Child gets home from school. However, the Juvenile Court found that when asked, Father had no concrete plan regarding who would watch the Child if he had full-time custody of her.

Father testified that he lives in Franklin, Tennessee in a nearly 6,000 square foot house worth over a million dollars with seven bedrooms and has about $400,000-500,000

of equity in his home. According to Father, the Child has a suite in his home that she will be sharing with her sister. Father's mortgage balance is $600,000 and his payments are around $3,300 per month. At the time of trial, Father testified that his mortgage payments had been deferred due to the Covid-19 pandemic and his unemployment. Father testified that he has $20,000 remaining in a savings account but acknowledged that he had a federal tax lien, a lien due to home improvement, and a lot of debt. He had listed his home for sale several times and had received an offer of one million a couple years prior.

Father testified he had shared equal parenting responsibilities for the Child with Mother prior to the Child's moving to Canada. Father further testified that despite his back injury, he is physically capable of caring for the Child. According to Father, he is very involved with the Child's schooling and extracurricular activities.

Father has family in Tennessee and in North Carolina. Father now has a younger baby with another woman and is engaged to the mother of his young baby. He also has three older children that go back and forth between his house and their mother's home. The Child has a close relationship with her half-siblings residing in Tennessee. Paternal Grandmother testified that she had moved into Father's home in June 2015, while Mother and the Child were residing there, but stated that she had moved out in June 2020. Paternal Grandmother has a close relationship with the Child. While living with Father, Paternal Grandmother denied that she performed most of the parenting responsibility and stated that Father was the "number one parent." According to Paternal Grandmother, she did the things Father asked her to do. She further testified that she helped with the cooking and cleaning. At the time of trial, Paternal Grandmother was living only a mile away from Father.

Father had his first visit with the Child under the new permanency plan prior to trial. Father drove to Canada to pick the Child up from Mother's home. The home where Mother was residing at the time of trial was listed for sale, and she admittedly removed the "for sale" sign from the yard before Father arrived for the visit. According to Mother, the listing will expire soon and her former mother-in-law was not planning to renew the listing. Mother's former mother-in-law testified that she had entered into a rental agreement with Mother and confirmed that if the property did not sell by the time the listing expired, she was going to take the listing down. The Child was with Father on her birthday, and Father did not allow Mother's family to speak to the Child on her birthday. He stated that Mother talked to the Child that morning and that he let Mother's family speak via Facetime with the Child the following day. When the Child returned from her visit with Father, Mother had to pick the Child up because Father would not bring the Child to the airport to meet Mother.

The Juvenile Court entered its judgment in August 2020, permitting Mother to move to Canada with the Child. The Trial Court found that Father was not a credible witness during trial, that he had difficulty answering questions directly, and that his responses in

court "were more 'politically correct' in anticipating what the Court wants to hear." However, the Juvenile Court found that Mother's credibility was "more solid" and that she was direct and candid with the court. The Juvenile Court found that when the parties' anticipated marriage did not occur, Mother "had no choice" but to relocate to Canada because she was unable to renew her visa, change her residency status, or obtain a driver's license in the United States.

The Juvenile Court determined that the parents were spending substantially equal time with the Child prior to the Covid-19 pandemic and, therefore, found there was no presumption in favor of or against Mother's petition to relocate. *See* Tenn. Code Ann. § 36-6-108(c) (2017). The Juvenile Court further considered the best interest factors in Tennessee Code Annotated § 36-6-106(a)(1)-(15) and made the following findings of fact:

> *(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child.* Both parents have a very strong bond with the child. Both have been extremely active in the care and nurturing of the child. Mother has been a stay-at-home mom actively involved in the child's schooling and activities such as story time at the library. Father has also been present to engage in activities with the child such as cheerleading and swimming.
>
> Mother has, however, been the parent who has mostly performed the majority of daily responsibilities for the child such as doctors, dentist, schooling and stable routine. Father has struggled with addiction, loss of employment and does not exhibit the emotional stability Mother has been able to maintain despite the stress of her residency status and this miserable, prolonged litigation. This factor weighs in Mother's favor.
>
> (2) *Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.* The Court first notes that Dr. Freeman testified he did **not** find parental alienation an issue in this case. Both parents testified they would encourage a close and continuing parent-child relationship between the child and the other parent, but really only as

long as they were the primary residential parent and had the child the majority of the time. Their relationship has been contentious and adversarial largely because this case has been going on so long.

Father, and his relatives, expressed their concern to Dr. Freeman that his relationship with the child would suffer due to Mother. "[Father] stated he has good reason to believe that his relationship with Autumn will suffer if his daughter is allowed to relocate with [Mother]. [Father] has reported Autumn has told him that [Mother] does not like him, his father or his brother. He also reported receiving emails from [Mother's] mother describing her strong dislike for him." [Paternal Grandmother] told Dr. Freeman "she is concerned about how [Mother] will behave and parent once out of the scrutiny of the court." But in fact, Mother has done very well getting settled since relocating and the parties were able to manage the first visitation without major issues.

Mother reported to Dr. Freeman "she would love to have a healthy relationship with [Father] in which they can co-parent Autumn together. She stated 'I don't think that will happen as long as we are in court.' She stated keeping the relationship civil between them is the best she can currently hope for and do." Mother said "I have found co-parenting with John rather manipulative and tricky. I am hoping that improves after the case is finalized."

Both parents have exhibited the ability to co-parent well with their former ex-spouses so the Court is encouraged that they could potentially manage this in the future. The biggest barrier in this case has been the constant litigation and the inability to get past the hurt and anger.

The Court is concerned with the recent minor problems with visitation: Father not bringing the child to the airport for Mother; not assuring Mother is able to talk with the child on her birthday; Mother pulling up the For Sale sign in her yard before Father's visit.

The Court finds Mother has a slight advantage with this factor as her credibility is more solid and her comments to Dr. Freeman about wanting to co-parent are consistent with her testimony at trial. Mother seems to be sincere where Father['s] comments were more "politically correct" in anticipating what the Court wants to hear.

*(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings.*

This factor is not applicable in this case. However, Mother did, on her own, attend a co-parenting class.

*(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care.* The parties are equally situated with this factor. While Father may have more financial resources than Mother to provide certain "extras", each parent is perfectly capable of providing these basic needs for the child.

*(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities.* The Court finds this factor favors Mother in being the primary and consistent caregiver for the child. While Father is to be commended on his mostly equal participation in parenting the child, and doing it very well, he had the benefit of paternal grandmother to assist him daily for almost the entirety of his parenting time for the last five years. The Court finds paternal grandmother was a very stable and substantial caregiver for the child based on grandmother's testimony and the testimony of other witnesses.

*(6) The love, affection, and emotional ties existing between each parent and the child.* Both parents have an enormous amount of healthy love, affection, and emotional ties with this child. This child is greatly loved by many. Parents equally share the weight of this factor.

*(7) The emotional needs and developmental level of the child.* Both parents demonstrated an equally capable ability to care for the emotional needs and developmental level of the child. Each is proactive in assuring the best education and extracurricular activities, Mother in her active involvement with school and other activities and Father desiring the best possible education and assuring outside activities as well. They equally share the weight of this factor.

*(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child.* The Court finds this factor favors Mother. Father has struggled with addiction that has caused major life-changing events: substance abuse treatment, depression, physical limitations, loss of employment and financial hardship. It remains uncertain whether Father has weathered this storm as he is still unemployed and still being treated for depression.

At the time of the trial, Father still did not have a job after letting his law license suspend for failure to comply with continuing education. It is

very concerning to the Court that Father was able to participate freely in all his children's extracurricular activities, including some with physical activity, but yet not able to keep up with his annual hours of legal education while he was managing his back pain. Father has relied heavily on monetary gifts from his family that just seem to keep coming. His motivation for stable employment is low. He is still being treated for depression, is encumbered with the responsibility of yet another child with a new partner and has no concrete plans for the future.

Mother, on the other hand, has greatly improved her circumstances. While she does not live the life of luxury that Father does, she has been able to secure safe and appropriate housing, total medical and dental care for the child and herself (thanks to the Canadian system), financial benefits and a plan for employment she would have never had in this country. Her stress level appears to have substantially decreased with her new life. She is in good health. She is emotionally much more stable than Father. The Court places the most weight in this factor for Mother.

*(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities.* There are a lot of relatives! This factor equally benefits both parents. There are siblings, half-siblings, step-siblings, ex-step-grandparents... this is a lucky child. She has an abundance of love on both sides of these families and both parents are doing an excellent job of incorporating these relatives into the child's life in a positive manner.

*(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment.* Of course this factor favors Father. The child has always lived in Tennessee until just a few months ago.

Just as Dr. Freeman said, we always want to see children in a stable environment and it is detrimental to remove a child from a dependent family support system. What Dr. Freeman did not know and could not have known at the time of his report, was whether Mother would be able to replicate this same dependent family support system in Canada. The good news is she has. While this factor does favor Father, Mother has shown both parents are able to provide this stable, satisfactory environment.

*(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person.* While there is some evidence in Dr. Freeman's report as to past emotional/physical abuse by Father to Mother,

the Court does not consider this factor to weigh in favor of either parent and does not find it to be [a] factor the Court considered.

*(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.* The Court does not find any person in either parent's home that is not totally appropriate and does not find this to be a factor to be considered.

*(13) The reasonable preference of the child if twelve (12) years of age or older.* The Court finds this factor is not applicable in this case.

*(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules.* Since neither parent is actively employed at the time of this hearing, it is difficult to make a determination as to this factor.

The Court remains concerned with Father's lack of employment and unrealistic anticipation of working a limited schedule to accommodate the child. Dr. Freeman's report indicated Father was previously employed as a senior trial counsel, working ten hours a day. The Court finds it rather incredulous that Father could find employment that would basically allow him to work part-time to be home with the child and be able to continue the lifestyle he now maintains. Certainly, Father will always be in a position to be a higher wage-earner than Mother in the future.

Mother has focused her attention on employment that would allow her to mirror her children's schedule (school job or veterinary job). The Court does not place a great deal of weight on this factor because of the employment uncertainty of both parents.

Both of these parents are equally devoted to this child and are good parents. Ultimately, the Court finds Mother to be more emotionally stable and solid to be the primary residential parent under these new changed circumstances. Mother appeared to the Court to be the more credible witness. Representing herself, she was direct and candid. It was clear she did not have the financial resources available to Father but she did an excellent job of prioritizing the needs of her children and herself at trial. Father, on the other hand, found it very difficult to directly answer any question, especially from the Court. His answers seemed too rehearsed. The Court has grave concerns about Father's credibility when he goes three years without working but is able to access T[enn]Care for himself while swimming in his pool with his children.

- 10 -

Mother is like the steadfast rock that cements the child's feet to the ground. Father is like the attractive, shiny, sleek yacht that sits in the harbor, mostly anchored, but sometimes cruising out at sea. A nice place to vacation, but not necessarily the best place to remain permanently.

(Internal citations omitted.) Upon consideration of the evidence before the court and the best interest of the child, the Juvenile Court granted Mother's petition seeking relocation to Canada and adopted an updated parenting plan that allowed Father parenting time with the child for six weeks in the summer, for the Child's spring break from school, and during the Child's winter break from school, as well as parenting time in Canada at any time with seven days' notice to Mother.

Father filed a motion to alter or amend the Juvenile Court's judgment, which was denied. The Juvenile Court found that the motion should be denied because Father's motion did "nothing more than disagree with the Court's findings." According to the Juvenile Court's order on the motion to alter or amend, there was no clerical mistake, changed circumstances, or newly discovered evidence that would support Father's request to alter or amend the judgment. Father timely appeals to this Court.

## Discussion

Although not stated exactly as such, Father raises the following issues for our review on appeal: (1) whether the Juvenile Court erred by determining that it was in the Child's best interest to relocate to Canada with Mother; and (2) whether the videoconferencing software inhibited the Juvenile Court's ability to understand and apply the evidence presented at trial.[1]

Our review is de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Kelly*, 445 S.W.3d at 692.

When Mother filed her petition, the statute in effect governing parental relocation, Tennessee Code Annotated § 36-6-108(c) (2017), read as follows:

If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to move with the child, the other parent may,

---

[1] In her brief, Mother included a motion requesting that this Court strike portions of Father's brief that include alleged facts that do not appear in the record. Mother is correct that this Court considers, with a very few exceptions not applicable here, only facts that are included in the record on appeal. Because we have not considered any facts not contained in the record before us, we deny Mother's motion as moot.

within thirty (30) days of receipt of notice, file a petition in opposition to removal of the child. No presumption in favor of or against the request to relocate with the child shall arise. The court shall determine whether or not to permit relocation of the child based upon the best interests of the child. The court shall consider all relevant factors including those factors found in § 36-6-106(a)(1)-(15).

Tennessee Code Annotated § 36-6-106(a) provides the following best interest factors to be considered by the court:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil

Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-1-106(a) (2021). "While the trial court is directed to consider the appropriate factors in reaching its decision, it is not required to list each factor with the court's conclusion about how that factor impacted the custody decision." *Port v. Hatton*, No. M2011-01580-COA-R3-CV, 2013 WL 865549, at *6 (Tenn. Ct. App. March 6, 2013), *no perm. app. filed* (Tenn.).

Father argues that the Juvenile Court made "numerous erroneous assumptions" concerning Father's and Dr. Bradley Freeman's testimony. As to Father's testimony, the Juvenile Court found that Father's testimony was not credible. Concerning the credibility of witnesses, our Supreme Court has instructed:

- 13 -

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

In making its decision that Father was not a credible witness, the Juvenile Court found that Father's comments during trial "were more 'politically correct' in anticipating what the Court wants to hear." According to the Juvenile Court, Father had difficulty directly answering the questions that he was asked, especially questions asked by the court, and his answers appeared "too rehearsed." The Juvenile Court also expressed concern with Father's credibility when he had been unemployed for three years and was on TennCare "while swimming in his pool with his children." As instructed in *Hughes*, we provide great deference to the Trial Court's credibility determinations, which will not be overturned on appeal unless clear and convincing evidence proves otherwise.[2] In this case, we find that no clear and convincing evidence exists to rebut the Juvenile Court's finding that Father was not a credible witness.

Father takes issue with much of the Juvenile Court's interpretation of the evidence. According to Father, the evidence presented during trial preponderates against the Juvenile Court's findings of fact. Taking into account the Juvenile Court's credibility determinations and all the evidence presented, we disagree.

The Juvenile Court considered each of the best interest factors in making its decision regarding whether to approve Mother's relocation to Canada. In its judgment, the Juvenile Court recognized that both parents had a strong bond with the Child and had been actively engaged in the care and nurturing of the Child. Father takes issue with the Juvenile Court contributing his parental responsibilities to Paternal Grandmother, while discounting Paternal Grandmother's testimony that Mother did little to care for the Child while living with Father. The Juvenile Court found that Mother had been the parent present for the

---

[2] That the trial was conducted by video conferencing due to the Covid-19 pandemic is not a valid reason for us to depart from the Tennessee Supreme Court's instructions in *Hughes*. Our Supreme Court has previously held that this Court must use the same deferential standard regarding credibility determinations as applied to live in-person testimony even when a witness testifies via telephone. *See Kelly v. Kelly*, 445 S.W.3d 685, 695 (Tenn. 2014) (holding that "a trial court is better-situated to gauge the credibility of a telephonic witness than an appellate court").

majority of the day-to-day responsibilities for the Child, which included doctor's appointments, dentist appointments, schooling, and providing a stable routine for the Child. The Juvenile Court clearly did not find credible the allegations by Paternal Grandmother that Mother did little to care for the Child. The Juvenile Court found that Mother had been the primary and consistent caregiver for the Child. The Juvenile Court commended Father on his effective and "mostly equal participation" of parenting the Child in recent years but acknowledged that Paternal Grandmother had been present in his home to assist him daily for almost the entirety of his parenting time. The Juvenile Court found that she had been a "very stable and substantial caregiver" for the Child. The evidence presented does not preponderate against the Juvenile Court's findings regarding this factor.

Regarding the moral, physical, mental, and emotional fitness of the parents, the Juvenile Court found that this factor weighed in favor of Mother. Although Father argues that the Juvenile Court essentially disregarded Mother's immigration issues, it is clear from the Juvenile Court's judgment that it had indeed considered this fact and found that Mother had no choice but to seek relocation to Canada after the expiration of her visa and the change in her residency status. The Juvenile Court found that Mother had greatly improved her circumstances since relocating to Canada, that her stress level had decreased, and that she is in good health. The Juvenile Court also considered Father's struggle with addiction and his loss of employment and found that Mother had more emotional stability. According to the Juvenile Court's findings, Father continues to be treated for depression, is now responsible for the care of a new child, and has no concrete plans for the future.

Concerning continuity, the Juvenile Court acknowledged that the Child has always lived in Tennessee until recently, which favored Father. In his brief, Father argues that the Juvenile Court "seemed to diminish the importance" of this factor and stated that Dr. Freeman had recent conversations with Mother and the Child and had indicated to the court that his recommendation in the report had not changed. Dr. Freeman testified as an expert witness in forensic psychiatry and comprehensive fitness for parenting. "[D]eterminations concerning the admissibility, qualifications, relevance, and competency of expert testimony is left to the sound discretion of the trial court." *Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 287 (Tenn. Ct. App. 2012). The Juvenile Court found that Dr. Freeman was a credible expert witness but opined that much of his information was outdated due to the change in the parties' living situation since his evaluation. The Juvenile Court found that Dr. Freeman completed his evaluation of the parents in February 2019. However, in June 2020, Mother moved with the Child to Canada with the permission of the court. Although the Juvenile Court considered Dr. Freeman's report and relied on portions of it, it found that much of it was outdated. The Juvenile Court clearly disagreed with Dr. Freeman's opinion that it would be in the Child's best interest to live in Tennessee with Father based on the parents' circumstances at the time of trial. The Juvenile Court was not required to adopt and agree with Dr. Freeman's opinion but instead was free to base its decision on the entirety of the evidence presented to it.

The Juvenile Court found that both parents would be able to provide a stable, satisfactory environment for the Child. According to the Juvenile Court, Mother had done well since her relocation with the Child to Canada and was in a better financial situation than she had been in while in the United States. Additionally, the Juvenile Court considered the parents' respective support systems and found that the Child was lucky with several relatives on both sides of the family, with both parents successfully incorporating those family members into the Child's life in a positive manner.

At the time of trial, neither parent was employed. Father argues that the Juvenile Court did "not indicate its findings" regarding the employment related factor. Our review of the Juvenile Court's judgment does not support this contention by Father. The Juvenile Court did not place much weight with this factor due to the uncertainty of the parents' employment. However, it considered that Father likely would not be able to find part-time employment that would allow him to be home with the Child and yet also allow him to maintain his current lifestyle. The Juvenile Court considered this statement to the contrary by Father to be unrealistic. Additionally, the Juvenile Court found that Mother was focusing her attention on employment that would allow her to mirror the Child's schedule and noted that Mother was attempting to obtain employment in the Child's school or at a veterinary office. As noted, while the Juvenile Court did not place much weight on this factor due to the uncertainty of the parents' future employment, it did consider the facts relevant to this factor.

According to Father, the Juvenile Court "ignored the testimony of the Mother in reference to her resources and abilities." However, the Juvenile Court considered Mother's current situation in Canada in making its decision. Despite the fact that Father may be able to provide more luxuries for the Child, the Juvenile Court found that both parents were capable of providing for the emotional needs and basic necessities of the Child. The evidence presented does not preponderate against this finding by the Juvenile Court.

The Juvenile Court considered each parents' willingness to encourage a relationship with the other parent. According to Father, the Juvenile Court ignored Dr. Freeman's testimony concerning negative statements Mother made about Father. However, the Juvenile Court had considered this issue and emphasized that Dr. Freeman clarified in his testimony that he had not found parental alienation to be an issue in this case. Mother testified at trial that if she had custody of the Child, she would encourage a relationship between Father and the Child. The Juvenile Court recognized the parents' contentious relationship and found that Mother appeared to be more sincere in her desire to co-parent with Father, whereas Father's comments were more "politically correct."

The Juvenile Court found that Mother had managed to do "very well getting settled" in Canada since relocating and that the Child's first visit with Father had occurred without any major issues. However, the Court did express concern regarding "minor issues" that occurred, including "Father not bringing the child to the airport for Mother; not assuring

- 16 -

Mother is able to talk with the child on her birthday; Mother pulling up the For Sale sign in her yard before Father's visit." We agree with Father that he had testified during trial that it was Mother's family, not Mother, who were unable to speak to the Child on her birthday. Mother acknowledged that Father called her briefly on the morning of the Child's birthday but stated that when she called back that afternoon, she could not get through. Even if the statement by the Juvenile Court about Father "not assuring Mother is able to talk with the child on her birthday" is contradicted by the testimony at trial, the evidence presented at trial does not preponderate against the remaining findings by the Juvenile Court concerning best interest.

As previously stated, we must give great deference to the Juvenile Court's findings regarding witness credibility. The evidence in the record on appeal does not preponderate against the majority of the Trial Court's findings with regard to custody and those findings support the Juvenile Court's determination that it is in the Child's best interest to relocate to Canada with Mother. We find and hold, as did the Juvenile Court, that allowing Mother to relocate with the Child to Canada is in the Child's best interest.

Father also raised an issue concerning whether the court's utilization of video-conferencing software had inhibited the Juvenile Court's ability to understand and apply the evidence presented by the parties during trial. On appeal, Father requests that this Court remand to the Juvenile Court "preferably for in-person proceedings to insure that the trial court is able to reliably hear and understand the evidence and arguments being made and is able to avoid the issues created by the use of videoconferencing software." Mother, however, averred that there were no major audio issues causing confusion with the proceedings. We agree with Mother. Since early in the Covid-19 pandemic, our Supreme Court has encouraged the use of video-conferencing software in conducting court proceedings. *In re COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. April 24, 2020).

Upon our review of the transcripts, we find no evidence to suggest the Juvenile Court misunderstood or misapplied the evidence before the court. In his brief, Father points to statements by the Juvenile Court finding that Mother was comparable to a "steadfast rock that cements the child's feet to the ground" while describing Father as the "attractive, shiny, sleek yacht that sits in the harbor, mostly anchored, but sometimes cruising out at sea. A nice place to vacation, but not necessarily the best place to remain permanently." According to Father, technology issues "undoubtedly must have led" to the Juvenile Court's mischaracterization of the parties.

We acknowledge that technology issues arise, as they did in this case. However, the Juvenile Court ensured that the issues were remedied each time. We disagree with Father's argument and find no indication that the Juvenile Court misunderstood or misapplied the evidence in this case. Father's disagreements with the Juvenile Court's findings of fact provide no support for Father's conclusion that the Juvenile Court misunderstood or misapplied the evidence. The evidence presented to the Juvenile Court

- 17 -

does not preponderate against the extensive findings of fact made by the Juvenile Court. We find Father's argument in this regard to be unavailing.

## **Conclusion**

The judgment of the Juvenile Court allowing Mother to relocate with the Child to Canada is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, John G., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE